UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Crim. No. 24-cr-10001-LTS-1 |
| ) | |
| TRAVON BRUNSON ) | |

**DEFENDANT'S SENTENCING MEMORANDUM**

Prior to his arrest on January 9, 2024, Travon Brunson had never appeared before a Court as a defendant in a criminal case. Before that day, he had never seen the inside of a jail cell. Now, having pled guilty to the first and only charge he has ever had, Mr. Brunson faces the prospect of a lengthy federal prison sentence because of his self-described "foolish" and "dangerous" choices. He has accepted responsibility for straw purchasing firearms for his co-defendant who resold them in the Greater Boston area. Mr. Brunson's otherwise upstanding background, circumstances at the time of the offense, and post-arrest efforts to turn his life around merit a sentence of 18 months of incarceration followed by 36 months of supervised release. This sentence is sufficient, but not greater than necessary, to comply with the purposes enunciated in 18 U.S.C. § 3553(a).

I. **Travon Brunson's Background and Personal Characteristics**

Mr. Brunson was raised in and has spent nearly his entire life in Columbia, South Carolina. He is the youngest of five children and the only boy born to his parents, Oscar and Vasie Brunson. Mr. Brunson has four older sisters: Latoya, Oletta, Chamitra, and Adrienne. Mr. Brunson and his siblings were raised in a loving and supportive home. Mr. Brunson's mother worked for many years as a childcare specialist, both in schools and daycares. His father was a South Carolina state trooper for 34 years, retiring with the rank of captain in 2009. Oscar then

1

worked for the Richland County Sheriff Department until he retired in 2015. Mr. Brunson's parents were hardworking people who provided for their children and sought to instill good values in them. The family was also actively involved in their local Southern Baptist Church. Oscar served as a Deacon in the church. Mr. Brunson would attend services every Sunday while he was growing up.

Mr. Brunson had a stable and healthy upbringing. Mr. Brunson had good relationships with both of his parents. He and his mother were particularly close; Mr. Brunson's mother taught him to cook and instilled a love for spending time in the kitchen in him at a young age. His good relationship with his family has continued into his adulthood. Mr. Brunson currently lives with his parents and has done so throughout most of his life apart from 2015-2020. All but one of his sisters continues to reside in Columbia and he sees and speaks with them routinely. Mr. Brunson is also particularly close with his 97-year-old grandmother, Sarah Phillips. Ms. Phillips helped raise Mr. Brunson when he was growing up. He has returned the favor to her as she has grown older, doing chores at her house and visiting as frequently as possible. Mr. Brunson considers himself deeply fortunate



*Travon and His Family*

to have a tightknit, devoted family by his side. He is also immensely ashamed of the pain that he caused them through his actions. As he notes in his letter to the Court, he has witnessed "the strain on [his family members'] faces" since his arrest. Ex. 1. He knows that by committing these crimes, he let his loved ones down, disappointed them, and brought pain to them that they did not

2

deserve.

One of the brightest times in Mr. Brunson's life came when he was in high school. Football has been one of his passions throughout his entire life, both watching and playing. He played on his high school's football team and has fond memories of the sport. He was also actively involved in his church and was a member of the choir.

Mr. Brunson has been a hard worker since he graduated from high school. His first job was with UPS loading trucks. He then held positions with McDonald's, Home Depot, Rent-A-Center, and several small companies based in South Carolina. Unfortunately, like so many working-class individuals, employment positions have not always been easy for Mr. Brunson to hold on to. He has had the difficult experience of having to leave several jobs when the position ended. He has also switched jobs in the hopes of making a few extra dollars an hour, leaving a job in 2023 to take another that raised his hourly wages from $13 to $16. This may not seem like much money to some people, but for someone like Mr. Brunson, who only has a high school diploma, it was a significant step up and worth the transition.[1]

The government characterizes Mr. Brunson's employment history as "underwhelming and bordering on concerning" because he has had a series of "entry level hourly job[s]" that he left "without upward movement either internally or in the next job." ECF No. 71 at 29. Likewise, the government criticizes Mr. Brunson for being intermittently unemployed for four and a half years since his high school graduation.[2] *Id.* The only aspect of Mr. Brunson's employment

---

[1] The minimum wage in South Carolina is a paltry $7.25 an hour. *See* https://www.ncsl.org/labor-and-employment/state-minimum-wages (last visited March 17, 2025).

[2] Of note, Mr. Brunson was unemployed from January 2020 to December 2021, which encompassed the early days of the Covid-19 pandemic. The national unemployment rate in 2020 rose as high as 14.7%. *See* https://www.bls.gov/opub/ted/2020/unemployment-rate-rises-to-record-high-14-point-7-percent-in-april-2020.htm (last visited March 17, 2025). South Carolina experienced the largest one month increase in the number of unemployed workers in state history from March to April 2020. *See* https://dew.sc.gov/news/2020-05/south-carolina-employment-situation-april-2020 (last visited March 17, 2025). Thus, Mr. Brunson, who was laid off from

3

history that is "concerning" is that the government felt it was appropriate to argue it as an aggravating factor in determining his sentence. Not every person attends college or graduate school or climbs the proverbial corporate ladder. Honest, hard-working people spend their lives loading shipments at Home Depot and driving delivery trucks for Rent-A-Center. There is not a single thing that is "underwhelming" about this kind of work. The reality of manual labor and the job market is that employment is not always stable or steady. Mr. Brunon lost some jobs when temporary positions ended or moved on to others when new opportunities presented themselves. He lost a job with decent wages when he was arrested in this case in January 2024. Another was terminated by an unhappy boss shortly after his pretrial services officer visited him at his work site. What is apparent, however, is that Mr. Brunson has consistently made efforts to work and find work throughout his adult life. The government's argument about his employment history smacks of elitism and is demeaning not only to Mr. Brunson but to all those in the working class who do not lead lives of privilege. To argue that because Mr. Brunson has had a series of low wage jobs where he did not receive promotions somehow supports the government's request for a 41-month sentence is both senseless and offensive. The Court should give it no weight.

At the time of the conduct to which he pled guilty, Mr. Brunson was in his early 30s. His age at the time of this offense – his first and only – suggests that he poses a low risk to recidivate. Mr. Brunson was in his 30s when he purchased the firearms that he was convicted of transferring to Mr. Roache. It is well established that rates of recidivism decline as age increases. For those like Mr. Brunson who are in criminal history category I when sentenced, the recidivism rates are likewise quite low.[3] Thus, the combination of his age at the time of the crime

---

his previous position in December 2019, was in the midst of searching for work just as the economy cratered and unemployment skyrocketed to historic heights.

[3] *See Recidivism Among Federal Offenders: A Comprehensive Overview*, United States Sentencing Commmission

4

and his lack of prior criminal history, strongly suggests that Mr. Brunson is unlikely to be rearrested. This is bolstered by the fact that he has a supportive family system and, as discussed in section IV of this memorandum, that he has developed a long-term plan for his future that he has already set in motion.

Mr. Brunson's friends and family members have rallied to support him in the wake of his arrest last year. These folks, who know Mr. Brunson better than anyone, speak glowingly about his character and the effect he has had on their lives. Their letters speak of Mr. Brunson as a family man, who brightens the lives of those around him. Corley Byers, Mr. Brunson's best friend, describes him as a person who "has consistently demonstrated integrity, responsibility, and a strong sense of community." Ex. 2 at 5. His sister, Adrienne, notes the impact he has had on her and her young family:

> *Travon has always had a kind and giving nature, particularly when it comes to family. As a mother of two young daughters, I have relied on Travon many times and he has always stepped in selflessly. One particular moment that stands out is when my youngest daughter was preparing for a school performance. I was overwhelmed with other responsibilities, but Travon stepped in, helping her practice her lines and even offering encouraging words to calm her nerves. His patience and care turned what could have been a stressful situation into a cherished family memory.*

Ex. 2 at 6. Most importantly, Mr. Brunson will undoubtedly have the love and support of his family when this ordeal is over. As his father points out in his letter to the Court, this case has had an impact on the entire family, and they recognize that they must all work together to ensure that nothing like it ever happens again:

---

(2016) at 19-23, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf (last visited March 17, 2025). In this report, the Sentencing Commission found that for federal offenders who were between the ages of 31-35 when sentenced, the rearrest rate was 50.9%. This represents a marked decrease from the 71.1% rate for those younger than 21 and from 65.6% for those ages 21-25. Similarly, defendants who were in criminal history category I when sentenced recidivated at a rate of 33.8%, far and away the lowest rate of the six criminal history categories. By comparison, 54.3% of those in criminal history category II at the time of sentencing were rearrested. The recidivism rates, unsurprisingly, continue to rise with the criminal history category.

> *This experience has served as a wake-up call, not only for Travon but for our entire family, emphasizing the importance of mutual support and accountability. We are all fully committed to ensuring that Travon remains on a positive path, one that keeps him living legally and out of trouble for the rest of his life.*

Ex. 2 at 2. With his family at his side, the odds favor this case marking the first and only occasion that Mr. Brunson finds himself before the Court.

### II.    Nature and Circumstances of the Offense

Mr. Brunson does not dispute that he purchased several firearms at the behest of his co-defendant, Aizavier Roache. Likewise, he acknowledges that he was warned by ATF agents in 2021 that Mr. Roache was a felon and that it was unlawful to purchase any guns on his behalf. Despite all that, Mr. Brunson made a series of choices that were admittedly "foolish, dangerous, and ignorant" when he again bought six firearms for Mr. Roache in 2023. Mr. Brunson fully accepts responsibility for these actions.[4]

Mr. Brunson's conduct in 2023 occurred during an emotionally difficult period in his life. Mr. Brunson and Eliana Cox were in a long-term relationship with each other from 2014 to 2020. They lived together for the last several years of the relationship but broke up due to financial stress. Mr. Brunson paid nearly all their expenses, including rent, utilities, and food, towards the end of their time together. It became too difficult both financially and emotionally to handle everything himself, which proved to be fatal to their relationship. However, they briefly reunited in 2021 and Ms. Cox became pregnant. Throughout the pregnancy, Mr. Brunson was under the

---

[4] In a supplemental submission of offense conduct made prior to the completion of the final presentence report and in its sentencing memorandum, the government highlights text messages between Mr. Brunson and Mr. Roache that it argues support the notion that they were engaged in drug trafficking in addition to the firearm offenses. *See* PSR ¶ 30a; ECF No. 71 at 9-10, 18-19. Mr. Brunson firmly denies that he was involved in any form of drug distribution. He did not admit to such behavior at the Rule 11 hearing and contests that the government can establish by a preponderance of the evidence that he committed a drug felony. *See infra* at pp. 12-13. To the extent that he accepts responsibility for his conduct, he does so as to the charge in the indictment that he pled guilty to and not to any uncharged drug crime the government insinuates that he committed.

impression that he was the child's father. However, around the time of the child's birth, Ms. Cox confessed to Mr. Brunson that she has also been seeing another man when she became pregnant. She was unsure which of them was the father.

Ms. Cox's son, Makrie, was born on May 23, 2022. Mr. Brunson was unemployed when the child was born. He was not listed as the father on the birth certificate, and neither was the other man. Mr. Brunson, who had spent months preparing himself to become a father, still wanted to help Ms. Cox with the baby. He provided her with money for diapers, food, and other supplies for the newborn. Mr. Brunson still cared for Ms. Cox even though their relationship was over and it was possible that he was not her child's father. This experience was challenging for him in several respects. For one, it took an immense emotional toll on him. Mr. Brunson was depressed not only because Ms. Cox had been seeing someone else, but also because he might not be Makrie's father. The stress of not knowing the truth also weighed heavily on him. Mr. Brunson was also financially pressured to contribute to the child's care. He worked a series of relatively low paying jobs during this time, which did not leave him with a great deal of expendable income. Nevertheless, whenever Ms. Cox needed money to support the baby's needs, Mr. Brunson gave her what he could. He contributed money to her every month (and continues to do so to this day), even if it was as little as $60 at a time.

Against this backdrop, Mr. Brunson agreed to once again purchase firearms at Mr. Roache's behest. Mr. Roache knew about Mr. Brunson's financial predicament, with Mr. Brunson having told him about it one time when they were hanging out together. When Mr. Roache was once again in search of a source to purchase firearms for him, he contacted Mr. Brunson. The two were friendly with each other for a long time and Mr. Brunson agreed to do it. The six purchases all occurred from January to April 2023. This all took place on the heels of the

7

child's birth and the revelation that he might not be Mr. Brunson's biological son. Mr. Brunson was, understandably, in a difficult place in his life at this time. He made the ill-advised decision to again assist Mr. Roache, despite being warned against doing so two years earlier by the ATF. He did so out of a misguided, foolhardy belief that it was a good way to earn some quick money.

Needless to say, the circumstances surrounding Makrie's birth and the stressful months that followed are no excuse for Mr. Brunson's offenses. Having almost always been employed throughout his adult life, Mr. Brunson should have known that legitimate work was the only way to solve his financial stressors and contribute to the child's life. Context, however, always matters when considering why a person committed a crime. This is especially true when the person is a first-time offender who comes from a healthy, stable background with a loving family. At first blush, it is difficult to understand the disconnect between Mr. Brunson's upbringing and the conduct involved in this case. A closer examination of the surrounding circumstances makes clear that this is not something he did purely out of greed or because he is criminally inclined. Rather, his actions are those of a young man who found himself in an unfamiliar, upsetting stage of his life and made a gravely poor decision.

### III.    Procedural History

Mr. Brunson was arrested at his home in Columbia, South Carolina on January 9, 2024. He was held pending a detention hearing, which took place on January 16, 2024. The Court (Gossett, M.J.) released Mr. Brunson on January 22, 2024. He was released subject to several conditions, including being placed in the third-party custody of his father, random drug screens at the discretion of pretrial services, and GPS monitoring. Additionally, he was ordered to have no contact with Mr. Roache, not possess any firearms, and to stay away from any retailer or seller of firearms unless accompanied by his father. At his initial appearance in this District on

February 1, 2024, Magistrate Judge Kelley imposed the same release conditions. Mr. Brunson has fully complied with the Court's orders during the pendency of the case.

On October 29, 2024, Mr. Brunson pled guilty to the sole count in the indictment of conspiracy to traffic in firearms. The parties reached a plea agreement pursuant to Rule 11(c)(1)(B). ECF No. 55. Under the terms of the agreement, the government agreed to recommend a sentence at the low end of the guidelines, assuming that the total offense level is 22.[5]

### IV. Post-Arrest Conduct

After being arrested, Mr. Brunson knew that his life was at a crossroads. He had spent the better part of his twenties and early thirties working a series of low paying jobs. And it was out of financial constraints that he engaged in the conduct that led him before this Court. Mr. Brunson knew that at the conclusion of this case he was almost certainly going to be incarcerated. He began thinking about what he wanted his life to look like when this matter was behind him. Rather than wait until his release to begin making positive changes, Mr. Brunson enrolled in a commercial driver's license course in the spring of 2024. He completed the course and earned his CDL last August. A copy of Mr. Brunson's certificate of completion from trucking school is attached as Exhibit 3 to this memorandum.

After obtaining his CDL, Mr. Brunson spoke with several potential employers about positions with their companies. Unfortunately, none of them were able to offer him long-term employment as a trucker when they became aware of his pending case. Mr. Brunson was forthright and acknowledged that he would likely be incarcerated at the conclusion of the case.

---

[5] In the plea agreement, the parties erroneously calculated the total offense level using the 2024 guidelines manual. Probation made a similar error in the first draft of the presentence report and later noted that the 2021 manual should be used because of the timing of the offense prior to November 2023. The ex post facto issues with the plea agreement's guideline calculation are discussed *infra* at pages 10-11.

At least two of these companies told him that he should contact them when the case is closed because they were so impressed with his interview. Mr. Brunson plans to immediately seek work as a commercial truck driver when he completes his sentence and start developing a real career for himself.

Seeking and obtaining his CDL points to a change in direction for Mr. Brunson's life. His arrest and this case were indeed the wake-up call that Mr. Brunson needed to make real positive change for himself. The government's assertion that "a significant period of incarceration" is the only way for Mr. Brunson to "correct" his behavior thus falls flat. ECF No. 71 at 29. For one, this proposed sentence is hardly an insignificant term of incarceration for anyone, let alone someone like Mr. Brunson who has no prior criminal record. More importantly, however, the government's contention ignores the fact that Mr. Brunson has already demonstrated the capacity for growth and maturity. A longer period of imprisonment would be entirely counterproductive where Mr. Brunson has already taken the necessary steps to ensure that he has stable employment and never again finds himself in a situation such as this one.

V.      **Sentencing Guidelines**

   a. **Proper Guideline Calculation**

In the presentence report, the probation department concluded that the total offense level as 19. It reached this calculation based on the following:

| | | |
|---|---|---|
| Base Offense Level: | 12 | §2K2.1 |
| 25 to 99 Firearms: | +6 | §2K2.1(b)(1)(C) |
| Trafficking of Firearms: | +4 | §2K2.1(b)(5) |
| Acceptance of Responsibility: | -3 | §§3E1.1(a) and 3E1.1(b) |
| Total Offense Level: | 19 | |

Coupled with a criminal history category of I, Mr. Brunson's sentencing guideline range under this calculation is 30-37 months.

The parties agreed to a different guideline calculation in the plea agreement. The plea agreement contains the following guideline assessment:

| | | |
|---|---|---|
| Base Offense Level: | 14 | §2K2.1 |
| Three to Seven Firearms: | +2 | §2K2.1(b)(1)(A) |
| Trafficking of Firearms: | +5 | §2K2.1(b)(5)(C) |
| Firearms to be Used in Another Felony: | +4 | §2K2.1(b)(6)(B) |
| Acceptance of Responsibility: | -3 | §§3E1.1(a) and 3E1.1(b) |
| Total Offense Level: | 22 | |

With an offense level of 22, the guideline range is 41-51 months. The government agreed to recommend the low-end of this range: 41 months.

Mr. Brunson did not object to probation's assessment of the guidelines, despite the divergence from the plea agreement.[6] The differences between the two calculations are attributable to several factors. First, while discussing the plea agreement both parties failed to recognize that the 2021 Guidelines Manual should have been used due to the timing of the offense conduct. Probation also utilized the incorrect manual when the first draft was produced and recognized the error before either the government or defendant did. Use of the 2024 manual violates the ex post facto clause in two respects. First, it improperly increases the base offense level under §2K2.1 by two points from 12 to 14. Second, it increases the enhancement under §2K2.1(b)(5) from +4 to +5. The ex post facto violations result in an inaccurate inclusion of three additional points that are not attributable to Mr. Brunson's offense level. Had the parties applied the same enhancements in the plea agreement but used the correct manual, the total offense level in the plea agreement would have come out the same as the presentence report: 19. The way in which the level got to 19 would have been different, but the sentencing range would have been the same.

---

[6] Much like Mr. Brunson, his counsel acknowledges his mistakes. Namely, in assessing the sentencing guidelines when negotiating the plea agreement in this case, counsel recognizes that the calculation was incorrect in several respects.

11

Likewise, upon review of the presentence report and probation's rationale, Mr. Brunson agrees that the enhancement under §2K2.1(b)(1)(A) should be +6 as opposed to +2. Mr. Brunson also agrees with probation's rationale for not applying the enhancement under §2K2.1(b)(6)(B).[7] On that note, Mr. Brunson writes briefly to address the government's argument that the enhancement should be applied in part because the firearms were trafficked in connection with narcotics activity. ECF No. 71 at 14, 18-19. In support of this position, the government relies entirely on a text exchange between Mr. Brunson and Mr. Roache that is reproduced in ¶ 30a of the PSR. Based solely on this brief text discussion, the government states that the conversation "appears to implicate BRUNSON in the distribution of narcotics to ROACHE" and describes Mr. Brunson as having an "implied illicit narcotics business[.]" *Id.* at 9-10, 18. This argument fails on multiple levels. There is not a scintilla of evidence that Mr. Brunson is a drug dealer. It is frankly absurd to believe that federal law enforcement agents investigated Mr. Brunson and Mr. Roache for firearms trafficking, forensically examined Mr. Roache's cell phone, discovered incredibly damning text conversations between the two of them on the phone that confirmed the gun activity, and brought a federal indictment against them both but were unable to uncover evidence that the two were shipping drugs across state lines through the mail. These are not high-end criminals who were operating a sophisticated drug and gun running network. This was a rudimentary scheme that law enforcement uncovered without much difficulty. If they were involved in drug activity, the government would have found more evidence than a six-message long text string that makes oblique references to mailing pills. Moreover, even if one were to accept that there was drug activity afoot, the government has failed to link any trafficked

---

[7] Mr. Brunson notes that the Court did not apply this enhancement at Mr. Roache's sentencing despite the government's request that it do so. Probation similarly concluded in his case that the evidence was insufficient to justify its application. The purported justification for its application to Mr. Brunson appears largely the same as that offered to apply it to Mr. Roache.

12

firearms to it. There is no evidence to support the claim that Mr. Brunson maintained a firearm for himself, let alone one to further some ill-defined drug offense. The government cannot meet its burden on this point.

### b. The Court Should Not Find a Basis for an Upward Departure

In paragraph 105 of the presentence report, probation identifies two potential bases for an upward departure from the sentencing guidelines. The first is pursuant to U.S.S.G. §2K2.1 comment note 11(D), which provides that an upward departure may be appropriate if the offense posed a substantial risk of death or serious bodily injury to multiple individuals. The second, pursuant to §2K2.1 comment note 13(C), applies in cases where the defendant transported, transferred, sold, or otherwise disposed of substantially more than 25 firearms. Because the evidence in this case fails to support either basis for a departure, the Court should not apply one.

Though Mr. Brunson recognizes the dangers of illegal firearms and appreciates that some of these firearms were confirmed to have ended up in the hands of those who should have never had them, there is insufficient evidence to warrant a departure under note 11(D). The First Circuit has held that this commentary note "is reasonably interpreted to authorize departure for conduct that is dangerous to an extraordinary degree." *United States v. Diaz*, 285 F.3d 92, 100 (1st Cir. 2002). The Court also stated that "the threat to multiple individuals of death or bodily injury must be … obvious and potent[.]" *Id.* Here, while there is evidence that some of the firearms made their way to prohibited people and at least one was used in an act of violence, there is insufficient evidence to establish that Mr. Brunson knew they would be utilized in such a way. The fact that he was aware that Mr. Roache was a prohibited person does not impute an "obvious and potent" risk that the firearms would be used in a non-fatal shooting that Mr. Brunson would have been expected to be aware of. These facts are also in contrast with other

13

cases where courts appropriately imposed a departure on this basis. *See e.g.*, *United States v. Alers*, 852 F.Supp. 310, 314-16 (D.N.J. 1994) (where defendant caused more than 400 guns to be distributed to the drug underworld); *United States v. Diaz-Martinez*, 71 F.3d 946, 952-53 (1st Cir. 1995) (where defendant engaged in a shootout in a congested shopping center parking lot).

An upward departure under comment note 13(C) may be applicable in cases where the defendant trafficked substantially more than 25 firearms. "Application note 13(C) represents the Sentencing Commission's recognition that it may be appropriate to tie the §2K2.1(b)(5) trafficking enhancement to the number of firearms trafficked where that number becomes large, because otherwise it would not adequately reflect the seriousness of the crime." *United States v. Hernandez*, 633 F.3d 370, 378 (5th Cir. 2011). In *Hernandez*, the Fifth Circuit affirmed the district court's application of an upward departure where the defendant was personally responsible for straw purchasing 23 military style firearms and led an organization that was responsible for at least 328 firearm purchases. *Id.* at 372, 378. 103 firearms, most if not all of which were trafficked to Mexican drug cartel members, were directly attributable to the defendant. *Id.* at 379. By contrast, a departure is not warranted in cases with a significantly lower number of guns. *See id.* at 379 n.17 (noting that in a similar gun trafficking case, a departure would not have been appropriate for a defendant responsible for trafficking 28 military style firearms) (citing, *United States v. Guitierrez*, Fed.Appx. 540, 541 (5th Cir. 2010)).

Mr. Brunson pled guilty to trafficking six firearms in 2023 and does not dispute the 24 firearms purchased on Mr. Roache's behalf in 2021 and earlier. This produces a total of 30 guns, which can hardly be considered "substantially" more than the 25 needed to trigger grounds for a 13(C) departure. It is far more comparable to the number in *Guitierrez* (28) than that in *Hernandez* (at least 103 and as many as 328). In response to Mr. Brunson's objection to this

14

portion of the PSR, probation cites the fact that Mr. Brunson purchased "at least 46 firearms in South Carolina since May 2020" as further justification. This fails for two reasons. First, 46 is again not "substantially" greater than 25. Second, there is insufficient evidence that the additional 16 firearms were trafficked or otherwise the product of any illegal activity. There is no evidence whatsoever about those firearms other than the fact that Mr. Brunson supposedly purchased them at undefined times between May 2020 and his arrest in January 2024. Absent such a showing, they should not be attributed to him and should not form the basis for an upward departure.

## VI. The Needs a Sentence Must Fulfill

"Imposing a sentence on a fellow human being is a formidable responsibility," compelling "a court to consider, with great care and sensitivity, a large complex of facts and factors." *United States v. Gupta,* 904 F.Supp.2d 349, 350 (S.D.N.Y. 2012). The Court must conduct a "more holistic inquiry" than simply plugging numbers into a guidelines calculation, and "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle." *United States v. Yonathan Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008) (citing *Kimbrough v. United States*, 128 S.Ct. 558, 570 (2007)). That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id.* In reaching a decision on what constitutes an appropriate sentence, the Court should "consider all the relevant factors" and "construct a sentence that is minimally sufficient to achieve the broad goals of sentencing." *Id.*

18 U.S.C. § 3553(a)(2) requires the Court to fashion a sentence that considers the four needs that a sentence must fulfill: punishment, deterrence, incapacitation, and rehabilitation. A

15

sentence of 18 months imprisonment followed by three years of supervised release achieves these goals.

The first purpose of sentencing is to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." A sentence of 18 months in federal prison is far from insignificant, especially for someone with no prior record like Mr. Brunson. Mr. Brunson is still a young man. However, under this sentencing proposal, he would lose a significant portion of the prime of his life in federal prison. His career aspirations as a truck driver will be put on hold. It is also unlikely that the truth about whether he is a father will come out while he is incarcerated. This proposed sentence adequately reflects the seriousness of his conduct by taking away his freedom for a significant period.

At the same time, this proposal offers Mr. Brunson the opportunity to continue rehabilitating himself, a process that began during his time under pretrial supervision. While punishment may be an appropriate consideration at sentencing, so too is rehabilitation. Ideally, a person who receives a federal prison sentence will serve it, return to the community, and not reoffend. The best hope of that happening for Mr. Brunson is if he can begin his career and achieve a measure of financial stability. This is precisely why he went to trucking school after being arrested. Mr. Brunson knew that he had to do something to plan for his future. He was given an opportunity to remain on release while the case was pending and he chose to make productive use of the time. Given that there was a financial motivation for his offense, it stands to reason that finding productive work following his sentence is what Mr. Brunson most needs to avoid further trouble. The sooner this process begins, the better his chances of success.

Finally, Mr. Brunson asserts that he himself has been personally deterred from further criminal conduct. Having never been in this kind of situation before, Mr. Brunson fully

16

understands and appreciates the gravity of his actions. There was no bigger wakeup call than the period he spent in jail immediately after his arrest. He knows that he will be returning to custody for at least some time following sentencing. When he gets out and starts the process of building his future, the last place he intends to find himself again is before this Court or any other.

### VII.    Conclusion

Regardless of the Court's final determination as to the sentencing guidelines calculation, 18 months of imprisonment is the appropriate sentence in this case. The previous year was the most challenging of Mr. Brunson's life. For the first time, he became a defendant in a criminal case, spent time in custody, was affixed with a GPS monitoring bracelet, and faced the prospect of years in federal prison. Despite these difficulties, the events of that time may have set him on the course to live a healthy, productive life going forward. He developed critical work skills that he hopes will carry him throughout the rest of his life. Mr. Brunson also now knows the consequences of seeking a fast way to make money as opposed to working hard to earn a living. He very much wishes to serve his sentence and begin the next phase of his life. This sentencing proposal will allow him to do that without needlessly incarcerating him longer than necessary. For these reasons, Mr. Brunson urges the Court to adopt his recommendation and sentence him to 18 months in prison followed by three years of supervised release.

TRAVON BRUNSON<br>
By his attorney,<br>
<br>
*Daniel J. Gaudet*<br>
Daniel J. Gaudet, B.B.O. # 688120<br>
Carney, Gaudet & Carney<br>
20 Park Plaza, Suite 614<br>
Boston, MA 02116<br>
617-933-0350<br>
DGaudet@CarneyDefense.com

March 18, 2025

<u>Certificate of Service</u>

  I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on or before the above date.

*Daniel J. Gaudet*
Daniel J. Gaudet